Ryan J. Linder, Bar #19871
Drew M. Gully, Bar #20475
LINDER & GULLY PLC
60 East Rio Salado Parkway, Suite 900
Tempe, Arizona 85281
Telephone: (602) 277-7123
Fax: (602) 532-7675
rlinder@lindergully.com

Attorneys for Plaintiff Terry Nickle



# SUPERIOR COURT OF THE STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| TERRY NICKLE,<br><br>　　　　　　　　　　　　Plaintiff. | NO.　CV2017-014497 |
| 　　v.<br><br>AMERICAN FAMILY MUTUAL<br>INSURANCE COMPANY, S.I., a Wisconsin<br>Mutual Corporation, JOHN and JANE DOES<br>I-X; BLACK and WHITE<br>CORPORATIONS/PARTNERSHIPS I-X,<br><br>　　　　　　　　　　　　Defendants. | **COMPLAINT**<br><br>(Breach of Contract; Tort Non-Motor<br>Vehicle – Breach of the Covenant of<br>Good Faith and Fair Dealing) |

Plaintiff Terry Nickle, by and through undersigned counsel, hereby submits this Complaint against Defendant American Family Mutual Insurance Company, S.I. ("AmFam") as follows:

## JURISDICTION AND VENUE

1.　　This Court has jurisdiction, and venue is appropriate, because the Defendant is a corporation doing business in Maricopa County, Arizona, and caused events to occur in Maricopa County, Arizona, giving rise to the allegation of this Complaint.　The amount claimed in this Complaint exceeds this Court's minimum jurisdictional limitation.

2.      At all times material hereto, Defendant AmFam was a Wisconsin Mutual Corporation licensed to and doing business in Maricopa County, Arizona.

3.      At all material times, Terry Nickle was a resident of Pinal County, Arizona.

4.      The incident giving rise to Mr. Nickle's original claim (as further set forth below) took place in Maricopa County, Arizona on April 23, 2104.

5.      The AmFam Policy (as further defined below) at issue was formed in Maricopa County, Arizona.

6.      Defendants John and Jane Does I-X and Black and White Corporations/Partnerships I-X are and, at all times mentioned, were persons, agents, servants, employees, corporations and/or business entities whose true names and identities are not known to Plaintiff at the present time.  Plaintiff alleges, upon information and belief, that John and Jane Does I-X are citizens and/or residents of Maricopa County, Arizona, and that Black and White Corporations I-X were corporate entities conducting business within Maricopa County, Arizona.  At the present time, Plaintiff does not have the true names of John and Jane Does I-X and Black and White Corporations/ Partnerships I-X. However, at such time as any of these true names are ascertained, Plaintiff will seek leave of this Court to amend Plaintiff's Complaint to reflect the true identities of these individuals and/or entities, together with the appropriate charging allegations.

7.      This Complaint has been timely brought.

## GENERAL ALLEGATIONS

8.      From November 1, 2013 through April 24, 2014, AmFam had an active automobile liability insurance policy (Policy Number 2032-1229-01-50-FPPA-AZ, hereinafter referred to as "the Policy") issued to Minoo and Javad Rahiminejad for a 2008

2

Toyota Prius (VIN JTDKB20U083326022, hereinafter referred to as "the Insured Vehicle"). The Policy contained Underinsured Motorist Coverage with limits of $100,000 per person for each occurrence, and up to $300,000 total per occurrence.

9.      Minoo and Javed Rahiminejad were, at all times relevant hereto, residents of Maricopa County, and the Insured Vehicle was principally located in Maricopa County.

10.      On or about April 23, 2014, while the Policy was still in effect on the Insured Vehicle, Plaintiff Terry Nickle was operating the Insured Vehicle with the permission of its registered owners (Minoo and Javad Rahiminejad). As Mr. Nickle was a permissive user of the Insured Vehicle on that date, he was an Insured Person under the terms of the Policy.

11.      As Mr. Nickle was traveling on Cooper Road in Gilbert, Arizona at approximately 5:15 p.m., the Insured Vehicle's electrical systems suddenly stopped operating.  Given that the Insured Vehicle is partially fueled by stored electricity, the operating systems also stopped working.  Mr. Nickle coasted the Insured Vehicle as far to the right side of Cooper Road as possible under the circumstances, but the gear shift lever would not shift into "Neutral" so that he could push it completely off the roadway.  Apparently, the gear shift lever only works if the Insured Vehicle is operating.

12.      Mr. Nickle engaged the hazard lights of the Insured Vehicle (which were luckily still operational), and immediately got out of the Insured Vehicle to flag the heavy traffic safely around the Insured Vehicle.  As he did so, Mr. Nickle also contacted Minoo Rahiminejad to let her know what had happened with the Insured Vehicle, and called around to try to get a tow truck.  After approximately 15-20 minutes, he was able to get a tow truck to agree to come out to the scene.  The two truck dispatcher indicated the tow truck would arrive at the scene in approximately 30 to 45 minutes.

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

13.     After securing a tow truck, Mr. Nickle decided to look at the Insured Vehicle's operator's manual to see if it indicated a way to shift the Insured Vehicle into "Neutral" when it was not operating.

14.     Just as Mr. Nickle began looking through the operator's manual, he was approached by a Town of Gilbert police officer. After Mr. Nickle explained the situation to her, the police officer indicated that she would move her marked police vehicle around to the rear of the Insured Vehicle (it was parked in front of the Insured Vehicle at this point) to shield it from oncoming traffic. While it had been positioned on the side of Cooper Road and prior to the police officer's arrival at the scene, hundreds or thousands of other vehicles had driven by the Insured Vehicle in the same direction of travel (it was afternoon rush hour), and none had any trouble observing and avoiding the Insured Vehicle in its position on the side of the road.

15.     As the police officer was pulling her marked vehicle around to position her vehicle behind the Insured Vehicle, Julianne Bonner (who was driving a vehicle owned by Airtech Automotive) recklessly and negligently slammed into the back of the Insured Vehicle. At the time of this collision, Mr. Nickle was standing in the front passenger side doorway of the Insured Vehicle, looking through the operator's manual and leaning against the doorframe.

16.     As a result of Ms. Bonner smashing into the Insured Vehicle, Mr. Nickle was violently thrown away from the doorframe. He landed approximately 15 feet away from the Insured Vehicle with his hands hitting the ground first, then his knees and upper torso. As a result of this impact, Mr. Nickle suffered serious injuries requiring multiple surgeries and extensive medical treatment over the course of nearly three years. Mr. Nickle still suffers from pain and limited use of his arms. In fact, Mr. Nickle has

incurred approximately $280,000-$300,000 in medical expenses as a direct result of the injuries he sustained in this collision.

17.    At the time of the collision described herein, Ms. Bonner had an automobile liability insurance policy with a policy limit of $50,000 per person per collision. Further, Airtech Automotive had an automobile liability insurance policy with a policy limit of $50,000 per person per collision covering the vehicle Ms. Bonner was driving.

18.    Given the policy limits available under Ms. Bonner and Airtech Automotive's insurance policies, and in consideration of Mr. Nickle substantial injuries and damages, demand for payment of both of these policy limits was made in August of 2016. At that time, Mr. Nickle had not had any surgeries, and his medical expenses and damages were only a fraction of what they would ultimately become. Even so, Ms. Bonner's liability insurer (Bristol West Insurance Group) and Airtech Automotive's liability insurer (Farmers Insurance Company) quickly paid the full amounts of their respective insurance policies in recognition of the significant value of Mr. Nickle's claim and in order to protect their insureds (Ms. Bonner and Airtech Automotive).

19.    Following settlement with Ms. Bonner and Airtech Automotive for their combined policy limits of $100,000, Mr. Nickle informed his available underinsured motorist insurers of his claim. Specifically, Mr. Nickle was an "Insured Person" under the AmFam Policy with underinsured motorist limits of $100,000, and he also had another underinsured motorist policy through Geico Insurance Company with a policy limit of $25,000. Under Arizona law, all insurers and Mr. Nickle recognized that the Geico policy was excess to the AmFam Policy, meaning that the Geico policy only needed to compensate Mr. Nickle if his damages exceeded the combined limits of the two underlying policies ($50,000 under Ms. Bonner's policy, plus $50,000 under Airtech

Automotive's policy) and the AmFam Policy underinsured motorist limits of $100,000 ($200,000 total).

20.     Mr. Nickle asserted his underinsured motorist claims under both the AmFam Policy and his excess Geico policy on or about December 8, 2016.  Between settling with Ms. Bonner and Airtech Automotive, Mr. Nickle had underwent surgery on one of his shoulders and was undergoing physical therapy as a result of his injuries in the subject collision.  This surgery added substantial sums to the medical expenses Mr. Nickle had incurred as a result of his collision-related injuries, and also added significant pain, suffering, disability, frustration, time away from work, time away from hobbies, etc.  Mr. Nickle had surgery on his other shoulder scheduled for later in December of 2016 as a result of his collision-related injuries.

21.     Upon receipt of Mr. Nickle's demand, and in recognition of the extremely substantial damages Mr. Nickle had incurred as a result of this collision, Geico almost immediately tendered its $25,000 excess underinsured motorist policy limit to Mr. Nickle by sending a check in that amount to his counsel (Check Number 185472751, issued on December 30, 2016).

22.     Rather than immediately pay Mr. Nickle's claim (like Bristol West, Farmers Insurance, and Geico Insurance had done), AmFam indicated its intent to undergo additional "investigation" into Mr. Nickle's claim.  In January of 2017, AmFam requested medical authorizations so that they could look at years of Mr. Nickle's medical records from before and after the collision at issue.  Mr. Nickle provided the requested authorizations and allowed AmFam to gather and review years of records from numerous providers both related and unrelated to his claims.

23.     In February of 2017, AmFam requested that Mr. Nickle attend an examination with Michael Steingart, D.O. of ExamWorks.  Upon information and belief,

AmFam frequently sends claimants in the Phoenix area to Michael Steingart, D.O. of ExamWorks in order to get his opinion as to reasonableness of the care the claimant has received, and the causal relationship between the incident giving rise to the claim and the claimant's medical treatment.  Upon information and belief, AmFam sends claimants to Michael Steingart, D.O. of ExamWorks specifically because he routinely provides AmFam with an opinion that the claimant's treatment is unreasonable and/or unrelated to the subject incident giving rise to the claim.  In any event, Mr. Nickle complied with AmFam's request that he be examined by Michael Steingart, D.O. of ExamWorks.

24.   After one examination of Mr. Nickle and a review of medical records, Michael Steingart, D.O. of ExamWorks provided the opinion AmFam was seeking from him – namely, that only a very small portion of Mr. Nickle's treatment was reasonable or related to the collision at issue. He authored a report on March 10, 2017.

25.   On March 27, 2017, AmFam communicated to Mr. Nickle (through counsel) that, "Based on [the Steingart] report we feel [Mr. Nickle] has been compensated in full for any injury related to this loss, thus we will not be making any offers on the Underinsured Motorist Bodily injury claim you have submitted." (sic).  To date, this is the only communication of any specific basis for AmFam's refusal to pay Mr. Nickle his benefits under the Policy.

26.   In May of 2017, counsel for Mr. Nickle informed Geico Insurance Company of AmFam's position on this underinsured motorist claim, and offered to return Geico's uncashed check for the $25,000 underinsured policy limit, given that its policy was excess to AmFam's policy.  Geico's claims adjuster indicated that Geico's evaluation of the claim was far in excess of both the AmFam and Geico underinsured motorist policy limits even when stacked on top of one another and the underlying $100,000 insurance

payments (i.e. far in excess of $225,000), and indicated that Mr. Nickle should keep this payment as resolution of his excess underinsured motorist claim to Geico.

27.     In an effort to give AmFam every opportunity to comply with its obligations to Mr. Nickle under the Policy, Mr. Nickle mailed AmFam updated medical records and bills on August 14, 2017.  These records and bills contained updated records from Mr. Nickle's second shoulder surgery and the related physical therapy, and also contained an opinion from Mr. Nickle's treating orthopedic surgeon (Dr. Thomas J. Wall, M.D., Ph.D. of the Athletic Institute of Medicine).  Specifically, Dr. Wall indicated that Mr. Nickle's shoulder injuries and the related surgeries/treatment he received as a result of these injuries were "directly related" to the collision at issue, to a reasonable degree of medical probability.  Dr. Wall based this opinion upon his actual observations of the injuries as he surgically repaired Mr. Nickle's shoulders, Mr. Nickle's medical history and records, and his experience/expertise relating to orthopedic injuries.  Furthermore, AmFam was reminded in August of 2017 that not only had the two underlying liability policies paid their limits immediately upon Mr. Nickle's demand, but so too had Geico paid its underinsured motorist policy limit despite the fact that Geico's policy was excess to AmFam's policy.

28.     In the face of clear evidence demonstrating (1) nearly $300,000 in medical expenses, (2) statements from Mr. Nickle as to the significant detrimental impact his injuries have had on his life, (3) the significant pain and suffering Mr. Nickle suffered as a result of his collision-related injuries, (4) the frustration and inconvenience of years of medical treatment and decreased physical abilities, (5) an opinion from Mr. Nickle's actual surgeon indicating the reasonableness and relatedness of all of Mr. Nickle's treatment, and (6) the evaluation of three other insurers both in excess to and below the AmFam Policy that Mr. Nickle's damages far exceeded AmFam's policy limit, AmFam

8

mailed correspondence back on August 18, 2017 indicating that its "position remains unchanged in this matter, thus American Family Mutual Insurance Company will not be making any offers on this claim."

29.    As such, AmFam has denied Mr. Nickle's underinsured motorist claim relating to the collision described herein.

30.    Other than as described herein, AmFam has refused to provide any additional detail as to the basis of its denial of Mr. Nickle's claim despite repeated request to do so.

## COUNT ONE
### (Breach of Contract)

31.    Plaintiff realleges the allegations contained above, and incorporates the same by reference as though set forth fully herein.

32.    In the Policy's underinsured motorist endorsement (End. 55 (AZ) Ed 4/10), an "insured person" is defined in Paragraph A.1.b and A.1.c.  At the time of the collision described herein, Mr. Nickle was an "insured person" under the subject endorsement's definition.

33.    In the Policy's underinsured motorist endorsement (End. 55 (AZ) Ed 4/10), an individual is not an "insured person" unless that person has reason to believe that their use of the Insured Vehicle is with the express or implied permission of the Insured Vehicle's lawful possessor.  At the time of the collision described herein, Mr. Nickle was operating the Insured Vehicle with the express permission of the Insured Vehicle's lawful owners, Minoo and Javad Rahiminejad.

34.    In the Policy's underinsured motorist endorsement (End. 55 (AZ) Ed 4/10), an "underinsured motor vehicle" is defined in Paragraph 2 as a land motor vehicle which is insured by liability insurance at the time of the subject collision that provides liability limits for bodily injury of less than the full amount the "insured person" is

entitled to recover for their damages arising from a collision. At the time of the collision described herein, the vehicle Ms. Bonner was driving was a land motor vehicle which had applicable bodily injury liability insurance limits totaling $100,000 between two applicable policies (as described above), and Mr. Nickle is entitled to recover far in excess of these limits for the damages he suffered in the subject collision.

35.     In the Policy's underinsured motorist endorsement (End. 55 (AZ) Ed 4/10), and in exchange for insurance premiums AmFam had already been paid, AmFam promised to pay any "insured person" for compensatory bodily injury damages to which the "insured person" was entitled from the owner/operator of an "underinsured motor vehicle". Mr. Nickle was an "insured person" entitled to compensatory bodily injury damages from the owner/operator of an "underinsured motor vehicle", but AmFam has refused to pay Mr. Nickle such compensatory bodily injury damages.

36.     Mr. Nickle's bodily injuries were caused by the collision described herein, Ms. Bonner and Airtech Automotive were liable to Mr. Nickle for said bodily injuries as a result of Ms. Bonner's negligent operation of the Airtech Automotive motor vehicle, Ms. Bonner and Airtech Automotive's bodily injury liability insurance limits were insufficient to cover Mr. Nickle's damages, and all insurance limits underlying the AmFam Policy have been fully paid/exhausted in settlement of Mr. Nickle's claims.

37.     None of the exclusions contained in the Policy's underinsured motorist endorsement (End. 55 (AZ) Ed 4/10) apply to Mr. Nickle's claims asserted to AmFam as described herein.

38.     Pursuant to the express provisions of the AmFam Policy, and based upon clear evidence described herein, Mr. Nickle was entitled to payment of the full $100,000 underinsured policy limit of the Policy.

39.     AmFam has not only refused to pay Mr. Nickle the applicable policy limit, but has refused to make any offer whatsoever to pay any sum for Mr. Nickle's claim.

40.     As such, AmFam failed to perform its duties and obligations under the terms of the Policy despite being paid therefor, and/or failed to perform its obligations in the fashion required under the terms of the Policy.

41.     AmFam breached the Policy, and has caused substantial damage to Plaintiff in the form of unpaid benefits to which Plaintiff is clearly entitled.

42.     This action arises out of a contract and, as a result, Plaintiff is entitled to recover his reasonable attorneys' fees and costs incurred in this action pursuant to A.R.S. § 12-341.01 and/or the contract between the parties.

## COUNT TWO
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

43.     Plaintiff realleges the allegations contained above, and incorporates the same by reference as though set forth fully herein.

44.     The duty of good faith and fair dealing is implied in every contract, including the AmFam Policy.  As such, AmFam is required to give as much consideration to Mr. Nickle's interests (as an "insured person" under the Policy) as it does to its own interests in all aspects of investigating and evaluating Mr. Nickle's claim.

45.     Under Arizona law, AmFam "has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy.  It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy.  It cannot lowball claims or delay claims hoping that the insured will settle for less. Equal consideration of the insured

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

requires more than that." *Zilisch v. State Farm Mutual Automobile. Ins. Co.*, 196 Ariz. 234, 238, 995 P.2d 276, 280 (2000).

46.   As further set forth above, AmFam intended to, and did in fact, deny Mr. Nickle's underinsured motorist claim without a reasonable basis under the circumstances.

47.   As further set forth above, AmFam intentionally failed to pay Mr. Nickle's underinsured motorist claim without a reasonable basis under the circumstances.

48.   Having been given all of the relevant information surrounding Mr. Nickle's claim, AmFam knew or reasonably should have known that it acted without a reasonable basis with respect to Mr. Nickle's claim.

49.   Under the circumstances presented in Mr. Nickle's claim, AmFam's obligation to pay Mr. Nickle the underinsured motorist policy limits was not fairly debatable – the full limits should have been paid.

50.   AmFam failed to conduct an adequate investigation into the claims presented by Mr. Nickle, and instead conducted an investigation solely focused upon denying Mr. Nickle the benefits to which he was entitled under the Policy.  This is a breach of AmFam's duty of good faith and fair dealings.

51.   AmFam failed to act reasonably in evaluating the claims presented by Mr. Nickle, and instead evaluated Mr. Nickle's claim with an unreasonably and insupportably low value with the sole goal of denying Mr. Nickle the benefits to which he was entitled under the Policy.  This is a breach of AmFam's duty of good faith and fair dealings.

52.   AmFam failed to promptly pay Mr. Nickle's legitimate claim. This is a breach of AmFam's duty of good faith and fair dealings.

12

53.    In denying Mr. Nickle's legitimate claim, AmFam has not only jeopardized Mr. Nickle's security under the Policy, it has eviscerated it.  This is a breach of AmFam's duty of good faith and fair dealings.

54.    In denying Mr. Nickle's legitimate claim, AmFam has forced Mr. Nickle to go through needless adversarial hoops to achieve his rights under the Policy. This is a breach of AmFam's duty of good faith and fair dealings.

55.    In denying Mr. Nickle's legitimate claim, AmFam has denied and delayed payment of his claim with the hope that Mr. Nickle would settle for less or just go away.  This is an egregious breach of AmFam's obligation to treat its insured's interests with equal consideration, and is a breach of AmFam's duty of good faith and fair dealings.

56.    As a direct and proximate result of AmFam's breach of its covenant of good faith and fair dealings, Mr. Nickle has been substantially damaged in the form of the unpaid benefits to which he is entitled under the Policy, economic losses in the form of loss of use of the sums that AmFam rightfully should have paid on this claim, as well as emotional distress, humiliation, inconvenience, and anxiety experienced, and reasonably probable to be experienced in the future.

57.    AmFam, by and through its agents and employees, has acted with an evil mind and/or a reckless disregard for the rights of Mr. Nickle.  As such, punitive damages are appropriate in this matter.

58.    Plaintiff hereby invokes his right to a trial by jury for all triable issues in this case.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Terry Nickle demands judgment against AmFam for the following sums:

A.      For a compensatory damages relating to AmFam's breach of the Policy in the amount of Mr. Nickle's full damages, or in the alternative, such compensatory damages as the Court or a jury find appropriate;

B.      For compensatory damages relating to AmFam's breach of the covenant of good faith and fair dealings as the Court or a jury find appropriate;

C.      For attorneys' fees incurred in prosecuting this action;

D.      For costs incurred herein;

E.      For interest on the foregoing liquidated damages at the rate of ten (10%) percent per year from the date paid through the date of judgment;

F.      For interest on the foregoing at the maximum allowable rate from the date of judgment, until paid in full;

G.      For punitive damages;

H.      For such other relief as may be proper and just under the circumstances.

DATED this ___20th___ day of November, 2017.

LINDER & GULLY, P.L.C.

BY _____
          Ryan J. Linder
          Drew M. Gully
          60 East Rio Salado Parkway, Suite 900
          Tempe, Arizona  85281
          *Attorneys for Plaintiff Terry Nickle*

14